MEMORANDUM OF DECISION
On May 31, 2000, the Department of Children and Families, hereafter, "DCF," filed petitions for the termination of the parental rights of Ada S., to her two children, Joanna and Jazmine. DCF also filed termination petitions against the respective biological fathers of these children; Jose S., Joanna's father and Francisco U., Jazmine's father. DCF alleges that Ada S. has not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of these two children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112
(j)(3) (B1). As to the biological fathers, the petitions allege that both fathers have abandoned their daughters in the sense that they have failed to maintain a reasonable degree of interest, concern or responsibility as to their well being. Connecticut General Statutes § 17a-112
(j)(3)(A). They further allege that there is no ongoing parent-child relationship between the father and the two children, as the law defines that term. Connecticut General Statutes § 17a-112 (j)(3)(D).
The Court finds that notice of this proceeding has been provided in accordance with the Practice Book and this court has jurisdiction. None of the parties appeared for trial. Respondent mother was represented at trial by court appointed counsel, who participated fully in each step of the proceeding. Despite the extensive efforts made by both DCF and counsel to have respondent mother present in court for the trial, mother did not make herself available. There was evidence that mother called DCF several days before the trial to cancel a visit with her daughters as well as to inform DCF that she would not be attending the trial for medical reasons. The Court heard credible evidence that refutes any claim by mother that she was unable to attend the proceeding for medical reasons. Neither biological father ever appeared in any of the proceedings involving their daughters, and the court had previously entered defaults against them. The Court further finds that no action is pending in any other court affecting the custody of these children and that reasonable efforts have been made to locate the biological fathers.[2] The Court was presented with thirty-five full exhibits and heard the testimony of the social workers, the court appointed psychologist, the children's current foster parents, as well as Joanna's therapist. CT Page 8191
1. FACTS
Ada is the biological mother of four children; Joanna, born on January 1992, Jazmine, born on March 1995, Chantall, born on June 1998 and Nathaniel, born on June 2000. Ada is thirty years old. She was born and raised in Connecticut. She received a high school diploma through the adult and continuing education program in her community. She married the father of her first born child, Joanna, when she was twenty years old. He was a friend of her father's. The marriage was stormy and marked with alcohol abuse as well as domestic violence.[3] The couple separated for a short time immediately prior to Joanna's birth on January 26, 1992, however they reconciled shortly after her birth. The reconciliation efforts were unsuccessful and the couple separated soon thereafter and have had no contact since that time.
She met Jazmine's father, Francisco U., while visiting her brother. She entered into a relationship with him and on March 1995, she delivered their child. Francisco, however, had already left her declaring his preference for a different life style. She gave Jazmine the surname of the man with whom she was involved with at the time. On June 1998, Ada delivered her third child. The evidence indicates that the guardianship of this child has been transferred to the biological father. Her fourth child was born on June 2000. The evidence indicates that guardianship of this child has been transferred to the child's paternal aunt.[4]
Ada first came to the attention of DCF in February 1993, following her arrest and incarceration. Ada's criminal history[5] reveals that on May 20, 1991, she was arrested for Breach of Peace and ordered to appear in court on March 22, 1992 for disposition of the case. A rearrest order was issued due to her failure to appear in court on that date. On February 6, 1993, while the police were investigating her involvement in a domestic violence incident, the re-arrest order was served and she was taken into custody.
During the time of her incarceration, DCF removed Joanna, and placed her in foster care. Joanna experienced her first documented out of home placement. It was to be the first of many. Joanna was only one year old at the time of this separation from her mother. She was returned to her mother's care two weeks later.
Following this incident and prior to the birth of Jazmine in 1995, DCF received two additional referrals involving the neglect of Joanna. These referrals concerned medical neglect. On April 14, 1997, when Joanna was five years and four months old and Jazmine was two years and one month old, DCF invoked a ninety six-hour hold on both of the children and removed them from their mother's care. They were placed in foster care. CT Page 8192 The reason for the removal was Ada's call to DCF to report that her current boyfriend was abusing her and the children.
Both Joanna and Jazmine have remained in foster care since the original removal in April 1997. Joanna's placement record[6] indicates that since the first placement in 1997, Joanna has lived in twelve (12) different foster homes. Jazmine's placement record[7] indicates that she has been placed in fifteen different foster homes.
DCF offered Ada supportive services starting in April 1993, following Joanna's first out of home placement. Services offered included a parent aide to assist with parenting skills and appropriate discipline as well as sessions at a family center to help her develop skills to cope with her anger. In 1994 and in 1995, Ada received intensive preservation services that included a home health care aide to help Ada with Joanna's diet and care. The record indicates that Joanna suffered from gastrointestinal problems and required a special diet. Ada received assistance from a nutritionist with the University of Connecticut extension program to further assist her with Joanna's need for a special diet. She also was provided with family support from Mother's Place, a service provider in the New London area. Referrals were also made to the Department of Mental Health for evaluations to determine and identify the appropriate level of services to provide to Ada.
During the year 1996, DCF continued to work with Ada. Services provided included counseling regarding budgeting techniques and a parent aide. Jazmine and Joanna were also receiving the services of Birth to Three as well as the Head Start program.
Notwithstanding her involvement with all of these services, in 1997, Ada found herself involved in another abusive relationship. To her credit, she called DCF to report that her current boyfriend was physically abusing her and the children. DCF responded by removing the children from her care and providing her with a package of services that included domestic violence counseling, a parent aide, and enrollment in Phase I of the Thames River Family Program. The goal of these programs was to provide her with the necessary support to effectively recognize and deal with abusive relationships as well as to enhance her parenting capacity to include the tools necessary to protect herself and her children.
Since DCF's goal was to reunite Ada with her children, services were kept in place despite her minimal compliance. In 1999, Ada once again received the services of the Intensive Family Reunification program, as well as domestic violence education classes through the Women's Center. CT Page 8193
Most importantly, Ada was provided with a supervised visitation schedule at the Centro de la Comunidad, a community based organization. Unfortunately for Joanna and Jazmine, Ada did not take advantage of these services and her compliance was minimal. The visitation record indicates an inconsistent pattern of visitation.
The Court heard the testimony of Nancy Randall, the court appointed evaluator. Dr. Randall's Curriculum Vitae was entered as a full exhibit.[8] The parties stipulated and the Court recognized Dr. Randall as an expert in the field of psychology, including child psychology.
Dr. Randall testified that she first met Ada on July 27, 1997 when she was referred to her for a psychological evaluation to determine her capacity to parent her children. Dr. Randall subsequently evaluated her July 7, 1999, August 24, 1999 and July 5, 2000.[9] On December 12, 2000, Dr. Randall conducted an interactional evaluation of the relationship between Ada and her daughters.
Although Dr. Randall's report of July 27, 1997 states "that Ada has significant cognitive limitations that make it difficult for her to learn new tasks and skills as easily as others," the report also states that "these limitations do not prevent her from being able to learn the skills necessary to raise children."
It is in recognition of this, that Dr. Randall recommended that Ada "participate in individual therapy to work on the issues of dependency, domestic violence, judgment and impulse control." She also recommended that Ada have "ongoing, long term assistance" preferably "with hands on demonstrations."
Despite the referrals to the many services mentioned earlier in this opinion, Dr. Randall testified that Ada "has made very little progress over four years, she has little motivation to change." Dr. Randall noted that "there have been few changes in her psychological profile" since she has been evaluating her. Dr. Randall's report of August 2000 states that "she has now been evaluated in 1997, 1999 and 2000. On all of these evaluations, "she continues to show signs of emotional turmoil and a lack of good coping skills." It is difficult, if not impossible, to change if one does not recognize the need to do so. According to Dr. Randall, Ada "does not see any need for supportive services for herself."
Dr. Randall also testified regarding the impact of Ada's lack of progress on the children. She observed that "Joanna has many behavioral problems and disappointments over failed reunification efforts." Jazmine also suffers a great deal from the lack of consistency in her life. In CT Page 8194 Dr. Randall's opinion, "these children need consistency more than anything. They need to trust and form healthy attachments."
Jose S., father of Joanna, has played no role whatsoever in his daughter's life. According to DCF records, Jose was abusive to Ada, left her to live with another woman, and left the state of Connecticut. He has had no contact with Ada or his daughter.
Francisco U., father of Jazmine, left Ada before his daughter was born. He has had no contact with his daughter. Jazmine has no idea who her biological father is and as mentioned previously, she has no concept of family.
Joanna has some emotional ties to her mother; Jazmine has none. Although Jazmine suffers from a diminished capacity to form healthy attachments, she is beginning to develop a bond with her current foster parents. The court heard from the foster father who described his commitment to Jazmine. He explained that he and his wife are forming a bond with Jazmine and they are interested in meeting Jazmine's current needs while they nurture the relationship. He testified that they are considering pursuing an adoption. At this time, however, they are not prepared to accept this permanent responsibility.
The Court encourages DCF to do whatever it can to support this family as they consider this very important decision. However, the time granted should not be so extensive that Jazmine's need for permanency is further compromised.
Joanna's situation is more complicated than Jazmine's. The court heard testimony from her foster mother. She testified that she has been Joanna's foster mother since September 2000. She testified that she was very interested in bonding with Joanna and in fact wanted to adopt her. However, Joanna's behavior has deteriorated to the point that she is unsure if she will be able to continue to keep her in her home. She further testified that she observed that Joanna would become extremely agitated and aggressive after a promised visit with her mother did not occur. "Joanna would slam doors, fight with her sister, use bad language, even with me. Joanna would call her mother names and say that she [her mother] does not care about her, because if she did, she would come to visit." The foster mother further testified that Joanna inflicts injuries upon herself, such as cutting herself, when she is angry over being let down by her mother. She has expressed a desire to kill herself declaring that she has no one to love her, because if she did, she would not be in a foster home.
The foster mother asked that Jazmine be removed from her home six CT Page 8195 months after she was placed there due to her fear that Joanna would seriously hurt her sister. She testified that on one occasion, Joanna assaulted her sister so severely that Jazmine suffered a broken nose. In order to prevent any further injuries, the foster mother asked that Jazmine be placed in a different foster home away from Joanna.
The court heard conflicting testimony regarding whether or not Joanna should have any further contact with her mother given her fragile emotional condition. Dr. Randall testified that children manifesting the symptoms described by Joanna's foster mother have a need to be able to trust a consistent parent. As a result of the many disappointments experienced by Joanna, Dr. Randall opined that Joanna needs to have a sense of stability and continuity in her world and in her life. "Even though there is no pre-adoptive home, at least a termination would remove her from the state of limbo — she needs to know." Dr. Randall did not clinically evaluate these children. She did however, evaluate the children's relationship with their mother. Based on her own observations as well as a review of the children's records, and her training and experience as an expert in the field of psychology, Dr. Randall explained to the court that it is more damaging to Joanna to keep the relationship alive instead of severing it completely. In her view, ending the relationship means no further contact of any type.
The court also heard the testimony of Laura Palmer, a Licensed Clinical Social Worker and Joanna's therapist. She is on the staff of the Child Guidance Clinic. She met Joanna on January 15, 1998 and started to work with her in March of 1998. She works with Joanna once a week for fifty-minute sessions. She testified as someone who has worked with Joanna for over three years. She described Joanna's diagnosis as one that includes Post-Traumatic Stress Disorder as well as a mood disorder. She stated that "Joanna does have serious attachment issues and an idealized relationship with her mother . . . the lack of permanency has hindered Joanna's ability to develop attachments. Despite the inconsistencies in visits, to cut off visits with her mother would hurt Joanna." Ms. Palmer is working with Joanna with the goal of increasing her ability to manage her moods. She is also providing ego support. She described Joanna as longing to be with her mother and willing to make excuses for her failure to keep visits. Although she looks forward to her visits with mother, she is "neutral" after the visit occurs. The court concludes that Joanna has an emotional bond with her mother, which is not beneficial to her.
2. ADJUDICATORY FINDINGS
 A. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must show by clear and CT Page 8196 convincing evidence that "DCF has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts. . . ." Connecticut General Statutes § 17a-112
(j)(1). DCF alleges that the parents are unable or unwilling to benefit from reunification efforts. The Court concludes from the clear and convincing evidence that Ada has not benefited from the services offered to her and is unable and unwilling to benefit from any further reunification services. Given the fact that the whereabouts of both biological fathers have been unknown, efforts to reunify the children with their fathers were not possible. The Court also finds that the biological fathers are unwilling to benefit from reunification services.
Notwithstanding the Court's finding that Ada is unwilling and unable to benefit from reunification services, the Court concludes, from the clear and convincing evidence, that DCF took reasonable reunification steps in this case. The extensive list of services detailed above strongly support this finding. It is noteworthy that despite the finding made by the court (Driscoll, J) on January 23, 2001, that reunification efforts were no longer appropriate, DCF continued to provide visitation coordination and case management services. Ada did not cooperate with these services, to the detriment of her daughters.
B. Adjudicatoiy Findings
(1) Ada S.
On August 14, 1997, Joanna was adjudicated a neglected child and a disposition of protective supervision was ordered. On March 30, 1998, Jazmine was adjudicated a neglected child and committed to the custody of DCF. Joanna was once again adjudicated a neglected child on this same date and along with her sister committed to the custody of DCF. Their commitment has been extended since that time. The Court further finds, by clear and convincing evidence, that as of May 31, 2000, Ada S. had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of these two children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112 (j)(3) (B1).
The Court concludes that Ada's lack of rehabilitation is demonstrated by the years that DCF has been providing supportive services to enhance her parental capacity. Ada, has shown only a minimal compliance with the services. As a result, she has not done her part to promote the process of change and a speedy reunification with her daughters.
The second prong of the statute requires the Court to analyze the CT Page 8197 parent's rehabilitation, if any, "as it relates to the needs of the particular child," and to consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167, 554 A.2d 722
(1999). The court must then determine if Ada may experience a positive change at some time in the future and if so, determine if the required waiting time for her to become useful as a parent, is reasonable as it relates to the needs of the particular child.
To do this with any degree of reasonableness, the court must look at where Ada's skills were as a parent when she first came to the attention of DCF. As stated earlier, DCF had been providing support services to Ada since 1993, to assist her in retaining the children in her care. Despite the referral to supportive services, the children were forced to suffer a separation from their mother when they were placed out of her care in 1997. DCF continued to plan to reunify Ada with the children and to set up an extensive list of services to help reach that goal. Ada did not commit herself to do what was necessary to meet the basic needs of her children. As a result, she is not in a position now, nor will she be within a reasonable time, in a position to play a responsible role in the life of either of her children.
Joanna is nine years old and has been in foster care for almost half of her life. Jazmine is five years old and has been in foster care for over half of her life. The court heard testimony that Jazmine has been moved so many times in her short life that she does not even understand what a family is all about. She has no idea who her mother is and perhaps more tragically, does not understand the concept of family. She has even asked her own therapist if she is her mother. She is in desperate need for immediate stability and permanency.
Joanna is also plagued with insecurities and serious emotional problems. The court heard testimony that her need for stability, consistency and permanency is so great that it outweighs her many other needs.
The court concludes from the clear and convincing evidence that to wait a moment longer to seriously attempt to meet the immediate needs of these children for permanency is too long, given their needs. To require these children to remain in the uncertainty of foster care while their mother demonstrates very little desire or motivation to do the work necessary to be reunited with her children is unreasonable in this case. The past is usually a good indicator of the future. Ada's past includes at least seven years of services designed to assist her in meeting her parental obligations. To give her more time would mean that her needs and interests are superior to that of her children. Our statutory framework does not allow for that. The termination statute mandates the court to CT Page 8198 consider the age and needs of the child as it considers whether or not it is reasonable to allow a person additional time to attempt to rehabilitate.
The Court concludes, from the clear and convincing evidence that Ada has failed to rehabilitate herself within the meaning of the statute.
(2) Jose S.
The Court concludes from the clear and convincing evidence that Jose has abandoned his daughter, Joanna, in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Connecticut General Statutes §17a-112(j)(3)(A).
The court further concludes that Jose has no ongoing parent-child relationship with respect to Joanna as defined by the law. Connecticut General Statutes § 17a-112 (j)(3)(D).
(3) Francisco U.
The court finds by clear and convincing evidence that Francisco has abandoned his daughter, Jazmine, in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to Jazmine's well being. He had so little interest in his child, that he abandoned the child's mother right before Jazmine was born and has not had any contact with his family at all. Connecticut General Statutes § 17a-112 (j)(3)(A). The court further finds by clear and convincing evidence that there is no ongoing parent-child relationship between Francisco and his daughter Jazmine, as that term is defined by the law. Connecticut General Statutes § 17a-112 (j)(3)(D)
3. REQUIRED STATUTORY FINDINGS
The Court makes the following factual findings as required by CGS § 17a-112 (k):
 (1) Appropriate and timely services were provided by DCF to mother including domestic violence counseling, parenting classes, parent aide services, intensive family preservation services, visitation coordination and case management services. No services were provided to either biological father since their whereabouts were unknown to the department.
(2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family. CT Page 8199 The court also finds that all of the parents are unable and unwilling to benefit from any reunification efforts.
 (3) DCF, with the approval of the Court, set reasonable and realistic specific steps in order to facilitate reunification of the family. There was only minimal compliance by the mother. The efforts put forth by the mother were insufficient to enhance her skills to enable her to safely and appropriately parent her daughters. There was no participation by the fathers.
 (4) Whereas, Joanna has some emotional ties to her mother, Jazmine has none. As stated previously, the court concludes that Joanna has an emotional bond with her mother, which is not beneficial to her. Given that the children do not know their father, there is no emotional bond with either of them.
 (5) Finding regarding the age of the children: Joanna is nine years and four months old and Jazmine just turned six years of age in March.
 (6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return to their home in the foreseeable future and (A) the extent to which the parent has maintained contact with the children as part of an effort to reunite with them, provided that the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child. As detailed above, the court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of these children.
 (7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children or the unreasonable act of any other person or by the economic circumstances of the parent. The court notes no unreasonable conduct on the part of DCF or any other person or agency as to any of the parents. As far as the mother is concerned, DCF has worked for many years to provide support to her in her attempts to rehabilitate herself. The agency has also taken many steps to promote a meaningful and consistent relationship between Ada and her daughters, which Ada has been unable to accomplish.
 4. DISPOSITION
Joanna and Jazmine have been in foster care for four years. For the CT Page 8200 reasons stated earlier, they are placed in separate foster homes. Jazmine has been in at least fifteen different homes during this time. She has been in her present current home for three months and is beginning to connect with her foster parents. They are considering adopting Jazmine although they are not ready to commit to do so at this time. Jazmine will be evaluated in August of this year to determine the full extent of her learning disabilities. Once this information is made available to the foster parents, they will be in a better position to know if they can adequately meet Jazmine's needs. The foster father testified that he has observed a positive change in Jazmine's behavior from when she was first placed in his home. "At first, she had a hard time settings down, but now she is OK . . . she is proud of her room, keeps it neat and likes to be home . . . she is not as hyper as when she first arrived."
The foster father further testified that Jazmine has only mentioned her biological mother a few times and when she does she refers to her as Ada. Most of the time, she refers to the foster mother as "mami" which is Spanish for mommy. According to the foster father, she has never mentioned her biological father Francisco. The evidence is clear and convincing that Jazmine needs consistency and stability and that she needs it immediately. Although it is not certain that these foster parents will adopt her, the court finds that it is in her best interests to be free for adoption in the event that this may happen. In addition, by severing all connection with her biological mother. Jazmine will be free and open to begin to form healthy parental attachments that she so desperately needs.
The evidence is also clear and convincing that Joanna needs permanency and stability and that she needs it now. She is nine years old and if she is not placed in a stable situation and removed from "the state of limbo" as described by Dr. Randall, she may sabotage future placements and risk her small chance of living a somewhat normal life. Unlike Jazmine, however, she does have a memory of her mother as well as a connection with her. This connection has not served her well; in fact, it has caused her serious emotional harm. She has accumulated so many disappointments in her short life, that one can only hope that the treatment that she is currently receiving and that she will undoubtedly receive in the future will help her to achieve a significant level of happiness and fulfillment. Her therapist, Ms. Palmer, is not sure that this can ever happen.
Dr. Randall, however, believes that this will only happen if the relationship is severed and all contact between mother and daughter ceases at once. Weighing the damage done to Joanna against the benefit gained by her in keeping the relationship alive, Dr. Randall testified that the damage outweighs the benefit. Given mother's inconsistent CT Page 8201 visitation history, the risk of exposing Joanna to further disappointments each time her mother fails to keep a visit with her is too great and the court concludes that it would not be in her best interests.
The court concludes, based on all of the evidence, that termination of the parental rights of Ada S. and Jose S. are in Joanna's best interests. Accordingly, a termination of the parental rights of Ada S. and Jose S. to Joanna, is ordered. The court further concludes, based on all of the evidence, that termination of parental rights of Ada S. and Francisco U. are in Jazmine's best interest. Accordingly, a termination of the parental rights of Ada S. and Francisco U., is ordered. It is further ordered that the Commissioner of the Department of Children and Families be the statutory parent for Joanna and Jazmine for the purpose of securing an adoptive family and permanent placements for them. It is further ordered that all contact between Joanna and her mother cease immediately and no further contact is allowed between them. The Department of Children and Families is directed to provide Joanna with all of the services recommended and deemed necessary by her therapist and other mental health professionals to assist her in coping with this separation. These services shall include, but not be limited to, intensive daily therapy and counseling.
The Commissioner shall file with this court no later than thirty days following the date of judgment a written report of efforts to effect permanent placements for each child as well as a detailed accounting of additional services provided to Joanna. The Commissioner is also ordered to file further reports as are required by state and federal law.
 Lopez Child Protection Session